1

2

3

4

5

6

7                    UNITED  STATES  DISTRICT  COURT

8                 CENTRAL  DISTRICT  OF  CALIFORNIA

9

10

11  CONNIE J. PEARSON,              )     Case No. SACV 05-678-JTL
                                    )
12               Plaintiff,         )
                                    )     MEMORANDUM OPINION AND ORDER
13          v.                      )
                                    )
14  JO ANNE BARNHART,               )
    Commissioner of Social          )
15  Security,                       )
                                    )
16               Defendant.         )
    _____)

17

18                        **PROCEEDINGS**

19      On July 12, 2005, Connie J. Pearson ("plaintiff") filed a Complaint

20  seeking  review  of  the  Commissioner's  denial  of  her  application  for

21  disability benefits.  On August 18, 2005, the parties filed a Consent to

22  Proceed  Before  United  States  Magistrate  Judge  Jennifer  T.  Lum.

23  Thereafter, on January 3, 2006, defendant filed an Answer to Complaint.

24  On April 18, 2006, the parties filed their Joint Stipulation.

25      The matter is now ready for decision.

26  ///

27  ///

28  ///

**BACKGROUND**

On January 18, 2001, plaintiff filed an application for Disability Insurance benefits. (Administrative Record ["AR"] at 102-04). Plaintiff alleged that beginning on May 8, 2000, she was unable to work because she suffered from hip bursitis, muscle spasms, cramps, backache, headaches, and inability to sleep. She asserted that she could not sit, stand or walk more than thirty minutes secondary to pain and that she must recline and elevate her legs.  (AR at 106).   The Commissioner denied plaintiff's application for benefits both initially and on review.  (AR at 87-90, 92-95).

Thereafter, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR at 96).   On July 9, 2002, ALJ Steven Chaffin conducted a hearing in Orange, California.  (AR at 39-84).   Plaintiff appeared at the hearing with her counsel and testified.  (AR at 41-67). Additionally, Alan Boroskin, a vocational expert, and plaintiff's daughter, Shanalee Kayer, testified.  (AR at 67-83).   On August 20, 2002, ALJ Chaffin issued his decision denying benefits.  (AR at 16-25). The Appeals Council denied plaintiff's request for review of the decision (AR at 10-11, 5-8), and plaintiff filed a complaint seeking judicial review (SACV 03-1256).   Pursuant to stipulation for remand by the parties, the matter was remanded to the Commissioner for further proceedings.  (AR at 369-73).   Upon remand, the ALJ was directed to "address all relevant medical opinion evidence of record, providing supporting rationale for the weight assigned thereto, to include good reasons if such opinion is rejected.  The ALJ will also be instructed to obtain updated evidence, afford plaintiff the opportunity for a new hearing and issue a new decision."  (AR at 373).   The Appeals Council, therefore, vacated the decision and remanded the case to the ALJ "for

2

further proceedings consistent with the order of the court." (AR at 374). The Appeals Council also found that a subsequent claim for Title II benefits filed on September 1, 2003, was rendered a duplicate and ordered the ALJ to "associate the claim files and issue a new decision on the associated claims." (Id.; see AR at 577-79).

A second hearing was held on November 12, 2004, in San Bernardino, California, before ALJ David Ganly. (AR at 795-899). Plaintiff again appeared with counsel and testified. (AR at 806-07, 809, 822-24, 831-32, 836-39, 841-42, 852-83). Minh Vu, M.D., a medical expert, and Joseph Mooney, another vocational expert, also testified. (AR at 800-50; AR at 851-54, 884-95). On March 22, 2005, ALJ Ganly issued his decision, again finding that plaintiff was not disabled. In his decision, the ALJ concluded that plaintiff's bursitis of the right greater trochanter and corneal dystrophy were severe, but that these impairments did not meet or equal any of the criteria contained in the Commissioner's Listing of Impairments, 20 C.F.R. Section 404, Subpart P, Appendix 1. (AR at 366). Next, the ALJ determined that plaintiff retained the residual functional capacity to perform light work with the limitations described by the medical expert, Dr. Vu. (Id.). More specifically, the ALJ found that plaintiff was capable of lifting and/or carrying twenty pounds occasionally and ten pounds frequently. She could stand for six hours and walk for four hours in an eight-hour work day. The ALJ also found that plaintiff could sit for six hours in an eight-hour work day. Plaintiff could climb stairs occasionally but not ladders. She could occasionally stoop, kneel, crouch, and crawl. She would not be able to balance. She would be precluded from reaching overhead with her left upper extremity, and she was precluded from using foot controls. For safety purposes, she could not perform work that

3

required bilateral hearing. There was nothing in the record to support the need to elevate her legs or rest for long periods each day. (AR at 364). The ALJ concluded that plaintiff was able to perform her past relevant clerical work and ultimately found that plaintiff was not disabled pursuant to the Social Security Act. (AR at 366).

The Appeals Council did not assume jurisdiction based on exceptions received or on its own motion. (See AR 354-55). Therefore, the decision of the ALJ on remand is the final decision of the Commissioner. 20 C.F.R. § 404.984.

**PLAINTIFF'S CONTENTIONS**

1.   The ALJ failed to properly address the credibility of the lay witness;

2.   The ALJ failed to properly consider the opinions of treating physicians, Dr. Robert Hammatt and Dr. David Minna;

3.   The ALJ failed to properly consider the opinion of Dr. Mark Janis;

4.   The ALJ failed to properly consider the testimony of plaintiff herself; and

5.   The ALJ failed to consider plaintiff's mental impairment.

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied. DeLorme v. Sullivan, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence means "more than a mere scintilla" but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct.

4

1420, 28 L. Ed. 2d 842 (1971); <u>Desrosiers v. Secretary of Health & Human</u>
<u>Servs.</u>, 846 F.2d 573, 575-76 (9th Cir. 1988).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson</u>, 402 U.S. at 401.  This Court must review the record as a whole and consider adverse as well as supporting evidence. <u>Green v. Heckler</u>, 803 F.2d 528, 529-30 (9th Cir. 1986).  Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld. <u>Gallant v. Heckler</u>, 753 F.2d 1450, 1453 (9th Cir. 1984).


**DISCUSSION**

**A.   THE ALJ'S CREDIBILTY FINDING**

Plaintiff contends that the ALJ failed to properly consider plaintiff's own testimony.  Once plaintiff has proven by objective (or clinical) findings the existence of a medically determinable impairment that may reasonably account for the symptoms alleged, in the absence of affirmative evidence of malingering, the ALJ may not reject subjective allegations without citing clear and convincing reasons for doing so. <u>Batson v. Commissioner of the Social Security Administration</u>, 359 F.3d 1190, 1196 (9th Cir. 2004).  Plaintiff, however, "need not produce objective medical evidence of the pain or fatigue itself, or the severity thereof," nor must plaintiff present objective medical evidence of a causal relationship between the impairment and the type of symptom alleged. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1282 (9th Cir. 1996); <u>Johnson</u> <u>v. Shalala</u>, 60 F.3d 1428, 1433 (9th Cir. 1995) ("[O]nce an impairment is medically established, the ALJ cannot require medical support to prove the <u>severity</u> of the pain."). (Emphasis in original).

///

5

Plaintiff testified that her biggest problem is her right hip. (AR at 854). She could not stand or walk for longer than five to ten minutes (AR at 862, 863-64; see also AR at 53-54), and she could only sit twenty to thirty minutes even on a recliner (AR at 362). Plaintiff consistently indicated very high levels of pain and fatigue in the Health Assessment Questionnaires ("HAQ") completed as part of her visits to David Minna, M.D., her treating rheumatologist,[1] (AR at 333, 495, 500, 508, 512, 516, 522, 524, 526, 528, 530, 532). At the first hearing, plaintiff described her pain as being constant and at a level of seven and eight on a scale of one to ten, even though she was taking such medications as Vicodin and Oxycontin. (AR at 43, 45). However, Oxycontin affected her concentration, and Vicodin made her deathly ill. (AR at 870-71). She indicated that her memory and concentration deficits bordered on the severe, although she admitted that her memory improved since being off Bellergal. (AR at 61, 874).

Plaintiff further testified that she spent a great deal of time reclining. (AR at 55, 866-67, 879, 881-83). She claimed that she was told to elevate her legs due to swelling. (AR at 55). She testified at the first hearing in July 2002, that she had been using a cane about once or twice a week for approximately six to eight months. (AR at 54). It is not entirely clear whether a cane was recommended by any physician.[2] (AR at 54-55).

---

[1] Another physician, Mark Janis, M.D., performed a "Review of Systems" during each visit. Dr. Janis's report generally did not reveal complaints of fatigue or malaise. (AR at 424-437; see AR at 438).

[2] Plaintiff was asked:

 Q. Did any doctor recommend the cane?

 A. Dr. Minna is suggesting maybe possibly leaning towards

Plaintiff testified that she required the assistance of her daughter and a housekeeper to perform household chores, go to the market, and run errands. (AR at 46, 61, 875).

Plaintiff testified at the first hearing that she used to love to fly, but that she had not been able to do much traveling. (AR at 61). She had not taken any vacation in two years, and the last trip she took was to San Antonio for a family reunion.[3] (AR at 46-47). At the hearing, plaintiff testified she recently had to miss another reunion in St. Louis. (AR at 62).

In addition to her hip complaints, plaintiff testified that she had problems with sleep, although she did not wish to take sleeping pills secondary to fears of addiction, despite the fact that she took Oxycontin, which ALJ Chaffin described as being "the most addictive drug that a doctor can prescribe. . . ." (AR at 43, 61; see AR at 66).

Plaintiff also complained of depression (AR at 872), problems with memory and concentration (AR at 58, 61), pain in the left shoulder (AR at 47, 871), pain in the right shoulder (AR at 858, 871), pain in the knees (AR at 51), swollen hands and legs (AR at 51), pain in the thumbs (AR at 859) and hands (AR at 869, 871), headaches (AR at 53, 869), left arm difficulty secondary to her lumpectomy in 1995 (AR at 57), and foot problems (AR 866).

///

---

something, but I haven't given into it yet completely on a daily – (AR at 54-55).

There is nothing in Dr. Minna's records that indicates plaintiff needed or used a cane. (See AR at 721, 723, 725, 727, 729, 731, 733, 735, 737, 739, 741, 743).

[3] There is, however, an indication that plaintiff may have gone to New Zealand in September of 2000. (AR at 213).

1    Both ALJs Chaffin and Ganley found plaintiff not entirely credible.

2    (AR at 363).

3    **1.   <u>Lack of Objective Findings</u>**

4    Plaintiff, however, argues that the medical findings support her

5    testimony.  (Joint Stipulation at 21).  She cites, for example, a nerve

6    conduction study that revealed there was a small number of denervation

7    potentials.  However, the neurologist considered these abnormalities to

8    be "minimal," and required further clinical correlation.  (AR at 257-

9    58).  Dr. Minna noted that the electromyogram revealed "signs of mild

10   L5-S1 radiculopathy but distribution [of] pts. symptoms not consistent

11   with this finding."  (AR at 704).  In sum, Dr. Minna found that these

12   findings revealed "no significant abnormalities."  (AR at 275; <u>see</u> <u>also</u>

13   AR at 336.)  Although there were also some abnormalities on a lumbar

14   MRI, Dr. Minna considered the fact that plaintiff's workup for radicular

15   source pain was negative.  (AR at 334, 710).  Plaintiff also cites a

16   bone density study that revealed low density.  (AR at 335).  But

17   plaintiff cites to nothing in the record that suggests she experienced

18   any further symptoms or limitations from this condition.

19   On the other hand, various examinations of plaintiff revealed

20   findings of tenderness of the right greater trochanter (AR at 223, 253,

21   265, 483, 485, 492, 656), decreased range of motion of the hip (AR 253,

22   281, 485, 492; <u>but</u> <u>see</u> AR 483, 656), and antalgic gait (AR at 265, 267,

23   269, 271, 273, 275, 282, 324, 326, 328, 347).  These findings are

24   consistent with right greater trochanteric bursitis.  But Dr. Vu, the

25   medical advisor, testified that bursitis was a very benign condition.

26   (AR at 844).  This opinion is consistent with Dr. Minna's opinion.

27   Although Dr. Minna believed that plaintiff's physical examination was

28   consistent with trochanteric bursitis, treatment ordinarily prescribed

for this condition reportedly did not yield any significant benefits. Dr. Minna looked to differential diagnoses because of the intense pain and dysfunction claimed by plaintiff. (AR at 266). Dr. Robert Hammatt, an orthopedist, and plaintiff's original treating physician both indicated that other hip pathology must be ruled out, such as avascular necrosis, in order to explain plaintiff's complaints. (AR at 215).

The arthritis workup had been negative as was testing for a metastatic lesion and avascular necrosis. (AR at 266). X-rays of the right hip were essentially negative (AR at 223, 267), a bone scan was negative (AR at 216, 268), and an MRI of the right hip was similarly negative (AR 214, 268-69, 275, 747). Electrodiagnostic testing revealed minimal abnormalities (AR at 257-58), considered by Dr. Minna to be insignificant (AR at 275). An ultrasound of the lower extremities for plaintiff's complaints of edema was also negative. (AR at 273).

Contrary to plaintiff's assertions (Joint Stipulation at 21), a clinical examination similarly failed generally to reveal any neuromuscular abnormalities or deficits in motor power or reflexes. (AR at 265, 267, 269, 271, 273, 275, 277, 324, 330, 345, 347, 349, 492, 494, 499, 503, 511, 525, 630, 632, 637). Dr. Minna's treatment notes indicate that despite plaintiff's complaints of intense right thigh pain, the etiology of her complaints was not clear. (AR at 324, 714, 718, 720).

Thus, the Court finds that the record supports the ALJ's conclusions concerning the lack of objective evidence to explain the degree of symptoms alleged. Even so, plaintiff argues that the ALJ's credibility finding was insufficient because the lack of objective findings cannot be the sole basis for a negative credibility finding. (Joint Stipulation at 20). Bunnell v. Sullivan, 947 F.2d 341, 345 (9th

1   Cir. 1991).  However, although the lack of objective findings cannot be

2   the sole reason for finding plaintiff not credible, it is, nevertheless,

3   one  of  the  factors  to  be  considered.   Id.   Contrary  to  plaintiff's

4   assertions,  however,  the  ALJs  cited  other  reasons  to  support  their

5   credibility findings.

6        **2.   Inconsistencies in the Record**

7        In  addition  to  the  lack  of  objective  findings,  ALJ  Chaffin  also

8   cited  "significant  inconsistencies  in  the  record  as  a  whole"  that

9   undermined plaintiff's credibility.  (AR at 21).

10            **a.   Course of treatment**

11       The  ALJ  found,  for  example,  that  the  course  of  plaintiff's

12  treatment  was  "inconsistent  with  disabling  pain  and  loss  of  function."

13  (Id.)  Plaintiff  did  not  require  hospitalization  or  emergency  room

14  treatment,  and  she  declined  surgery,  as  noted  by  ALJ  Chaffin.   On  the

15  other  hand,  there  is  a  clear  indication  that  surgery  would  not  have

16  benefitted  plaintiff.   (AR  at  212).   Plaintiff  frequently  received

17  treatment  from  her  chiropractor  (AR  at  761-64),  she  received  multiple

18  injections  (AR  at  216,  219,  271),  and  Dr.  Minna  prescribed  medications

19  such  as  Oxycontin  and  Vicodin.  It  cannot  be  said,  therefore,  that  this

20  treatment  was  inconsistent  with  complaints  of  disabling  pain.

21            **b.   Activities of Daily Living**

22       Contrary  to  ALJ  Chaffin's  finding,  the  daily  activities  in  which

23  plaintiff  engaged  do  not  undermine  her  credibility.   The  ALJ  found  that

24  plaintiff  was  not  entirely  credible  because  she  was  independent  with

25  self-care  and  able  to  participate  in  activities  such  as  feeding  the  dog,

26  watching  television,  taking  short  walks,  reading,  managing  her  own

27  money,  and  speaking  with  friends  and  family.   (AR  at  21).   However,

28  plaintiff  need  not  show  that  she  is  "utterly  incapacitated  to  be

1  eligible for benefits."  <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir.

2  1989).  The activities cited by the ALJ are not "easily transferable" to

3  a work setting.  <u>Id.</u>

4         **c.   Indications of Symptomatic Relief with Medication**

5        On the other hand, as noted by ALJ Chaffin, there are treatment

6  notes that indicate "symptomatic relief" with medication.  (AR at 21).

7  This fact suggests that plaintiff's resting during the day is due to the

8  adoption of "a lifestyle," and not to any "need for such resting."  (AR

9  at 365).   But the evidence regarding whether treatment provided

10  significant symptomatic relief to plaintiff is equivocal, and Dr.

11  Minna's treatment notes are often inconsistent.  For example, as early

12  as August 27, 2001, following a trial use of Oxycontin, plaintiff

13  reportedly told Dr. Minna that there was approximately a fifty per cent

14  improvement in the intensity of her pain.  She noted improved sleep and

15  increased activity.  (AR at 715).  The only side effect that Dr. Minna

16  noted was constipation and "some fatigue with unusual activities."  (AR

17  at 715).  Dr. Minna checked "negative" in his "review of systems,"

18  indicating that plaintiff had no problems with daily living.  (<u>Id.</u>).

19        During the next visit, Dr. Minna indicated that with opiates, the

20  pain level allowed plaintiff to function.  (AR at 717).  On November 27,

21  2001, plaintiff reported that pain control was stable and that her sleep

22  pattern had improved, with attendant improvement in function.  Again, a

23  review of systems was negative for any problems with activities of daily

24  living.  (AR at 719; <u>see</u> <u>also</u> AR at 336).  On the same date, however,

25  Dr. Minna's report indicated that plaintiff was "functionally disabled"

26  despite the fact that there was no definite etiology for complaints and

27  despite the history and review of systems provided during the same

28  examination.  (<u>Compare</u> AR 719 with AR 720).  Thereafter, on December 27,

2001, plaintiff began to report "increasing areas and levels of pain complaints" including the right shoulder, bilateral knees, a sense of swelling in the hands, dyesthesias in the left foot with prolonged standing, and difficulties with activities of daily living are again noted in the review of systems.  (AR at 721).  However, Dr. Minna indicated in his letter of October 7, 2004, that plaintiff's thigh condition has remained essentially the same since his evaluation of December 7, 2001.  (AR at 554).  Moreover, despite plaintiff's complaints of pain and swelling in various parts of the body, Dr. Minna found that there was no objective evidence of synovitis, although the right shoulder complaint was consistent with rotator cuff disease. (AR at 722). Nevertheless, by June, 2002, activities of daily living are again reported unaffected, and shoulder complaints are now on the left (AR at 727, 728).  In August, 2002, the review of systems indicates complaints concerning activities of daily living, but concerning the right thigh at least, plaintiff reported an increased level of activity and "no limitations with self-care, ADLs. . . ." (AR at 729).

Clearly, therefore, the record is ambiguous, but where there are conflicts and ambiguities in the medical evidence, it is for the ALJ to resolve.  Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989).  If the ALJ's interpretation of the evidence is reasonable, then it must be upheld, even if the evidence would support another interpretation more favorable to plaintiff.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982); Burch v. Barnhart, 400 F.3d 676, 680-81 (9th Cir. 2005), quoting Magallanes, 881 F.2d at 750 ("Although the evidence of Burch's daily activities may also admit of an interpretation more favorable to Burch, the ALJ's interpretation was rational, and '[w]e must uphold the ALJ's decision where the evidence is susceptible to more than one

rational interpretation.'"). The ALJ's finding that plaintiff's complaints were inconsistent with the treatment record indicating symptomatic relief was a reasonable interpretation of the evidence.

### d. <u>Side Effects of Medication</u>

ALJ Chaffin's finding that "[t]here was no evidence in the medical record of any significant side effects" (AR at 21) was supported by substantial evidence although plaintiff had, throughout the course of her treatment, complained about various medications. Plaintiff complained that Ultram kept her awake. Plaintiff's physician then prescribed Darvocet for her. (AR at 268, 271, 272). Celebrex increased plaintiff's swelling, so she discontinued taking it. (AR at 268-69). She then started taking it again because of its reported efficacy. (AR at 270, 271; AR at 273, 275, 347). The only side effect reported was "fluid retention" (AR at 515, 518), for which plaintiff's doctor prescribed diuretics (AR at 268, 515, 708). Because Maxzide caused plaintiff to experience nausea (AR at 707), that medication was discontinued. Instead, she started taking K-Dur with Lasix. (AR at 708). There is no evidence that plaintiff suffered from "massive swelling" as she testified at the first hearing. (AR at 57). Plaintiff also testified at the second hearing that she suffered from an upset stomach from Actonel (AR at 869), but Dr. Minna's records indicate that the problem resolved itself (AR at 486).

Plaintiff's main complaint, however, was that she experienced decreased concentration and short term memory, which plaintiff attributed to Oxycontin, Bellergal, and Ambien. (AR at 870; <u>see</u> <u>also</u> AR at 58, 60). But plaintiff's short term memory improved with the discontinuation of Bellergal and Ambien (AR at 737, 739), and the treatment notes fail to disclose that plaintiff complained of any

significant side effects from the Oxycontin or any significant complaints of concentration deficits in general. (<u>See</u> AR at 717 [plaintiff specifically denied "any CNS[4] complaints from opioids"]). <u>See</u> <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1164 (9th Cir. 2001)("There were passing mentions of the side effects of Mr. Osenbrock's medication in some of the medical records, but there was no evidence of side effects severe enough to interfere with Osenbrock's ability to work").

### e.   **Plaintiff's Other Complaints**

Last, ALJ Ganly noted multiple complaints of headaches, nausea, pains in the shoulder, hands, thumb, and low back which he found to be occasional and "not inconsistent with aging generally."  (AR at 365). "Although the record indicates diagnoses of rotator cuff tendonitis of both shoulders and decreased range of motion (AR at 722, 724, 726, 728, 730, 732, 734), there is no further reference to shoulder problems after April, 2003 (AR at 738, 739).  As for plaintiff's other musculoskeletal complaints, Dr. Minna classified them as "polyarthralgias," but despite intermittent complaints of pain and "a sense of swelling" (AR at 729), Dr. Minna has repeatedly indicated that there is "no objective evidence of synovitis" (AR at 722, 724) and his "articular exam" repeatedly failed to indicate any findings of swelling or tenderness (AR at 722, 724, 726, 728, 730, 732, 734, 736).

Thus, plaintiff has failed to establish by signs and laboratory findings that she even has a medically determinable impairment in multiple parts of the body for which she has complaints, such as in the hands and knees.  The ALJ is free to disregard her complaints in those

---

[4] <u>See</u> AR at 264 (CNS symptoms include psychiatric disorders and "problems [in] mentation.").

14

areas.  <u>Cotton v. Bowen</u>, 799 F.2d 1403, 1407 (9th Cir. 1986).  The ALJ may also take into consideration the inconsistencies between plaintiff's complaints of pain where no medically determinable impairment is present.  <u>Fair</u>, 885 F.2d at 604, n.5 (ordinary techniques of credibility evaluation are applicable in Social Security disability hearings).

In summary, the ALJ cited sufficiently clear and convincing reasons for finding plaintiff not entirely credible.  The lack of objective findings, conflicting evidence as to whether plaintiff's condition improved with medications, inconsistencies between the record and plaintiff's complaints regarding side effects from the medication, and plaintiff's complaints of pain where no medically determinable impairment has been established, were sufficient to support the ALJ's conclusion.

**B.   <u>THE TESTIMONY OF THE LAY WITNESS</u>**

20 C.F.R. § 404.1513(d) provides that the Commissioner may use evidence from sources such as family and friends to show the severity of an individual's impairment and how it affects the individual's ability to work.   If the ALJ chooses to reject the testimony of such lay witnesses, he must provide reasons germane to each witness.  <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001); <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918-19 (9th Cir. 1993).

Plaintiff's daughter, Shanalee Kayer, testified at the first hearing that she saw plaintiff four or five days a week, five to six hours at a time.  She testified that there was a change in plaintiff's personality.  Plaintiff was crabby and irritable, and, she believed, "depressed a little because of maybe feeling useless and stuff like that."  When questioned further concerning her mother's psycholgoical state, Ms. Kayer indicated that plaintiff was "very depressed," but she

could not state exactly how she came to that conclusion.  She indicated that "being her daughter I can tell."  (AR at 79-80).  Plaintiff's symptoms were that she complained a lot.  Ms. Kayer also indicated that plaintiff lost track of conversations and she did not have the concentration to complete tasks.  (AR at 80-81).

She testified that plaintiff used to be very active and energetic, where she could not sit down.  Now, "she's on a recliner with her legs up and then makes herself to have to get up and, and walk, or take the dog out to walk ...  She's – can't bend down.  She can't use her knees to bend down, you know."  (AR at 81).

Ms. Kayer also testified that she helps her mother with grocery shopping, driving her to appointments, and sometimes cleaning house.  Plaintiff spent her day relaxing on the recliner, and she put ice on her hips.  (AR at 81-82).

Although ALJ Chaffin found that Ms. Kayer's statements were "somewhat credible," he gave them little weight because she was not qualified to give a medical opinion and because "her relationship to the claimant suggests that family interests would be well served by a favorable decision."  (AR at 22).

That Ms. Kayer is not qualified to render a medical opinion is not a valid reason for discounting her testimony.  As plaintiff argues, 20 C.F.R. § 404.1513(d)(3)[5] explicitly provides that evidence from non-

---

[5] The Commissioner argues that "current regulations do not require the ALJ to state reasons for rejecting the testimony of Plaintiff's daughter," noting that 20 C.F.R. § 404.1513(d) provides that the ALJ "may" use evidence from other sources, which is "permissive, not mandatory."  The Commissioner notes that the regulation had been changed since the holding in <u>Dodrill</u>, 12 F.3d at 918-19 requiring reasons "germane" to each witness.  (Joint Stipulation at 5-6).  However, plaintiff is correct that 20 C.F.R. § 404.1513(e) (1993), to which <u>Dodrill</u> referred, also used the permissive "may": Information from other

medical sources may be used to show the severity of an impairment.

Plaintiff also argues that Ms. Kayer's relationship to plaintiff is not a valid reason for discounting her testimony.  This Court agrees. Smolen v. Chater, 80 F.3d 1273, 1289 (9th Cir. 1996)("The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony.").  Notwithstanding this, remand is not required for further consideration of Ms. Kayer's testimony.

In his decision, ALJ Chaffin specifically addressed plaintiff's testimony concerning her asserted depression and concentration difficulties, noting her testimony that she "'probably/definitely' had a problem with concentration, yet she is able to drive, shop, cook, and do some household chores.  (AR at 58).  The claimant testified she couldn't remember visiting her doctors, but could remember details." (AR at 22).  The ALJ concluded that these activities were inconsistent with any "impairment-related mental limitations on her ability to perform basic work activities," despite plaintiff's allegations that her concentration/memory problems bordered on the severe.  Although ALJ Chaffin did not repeat this finding in discussing Ms. Kayer's testimony, "it is proper to read the ALJ's decision as a whole," and "it would be a needless formality to have the ALJ repeat substantially similar factual analyses" in discussing both plaintiff's testimony and Ms. Kayer's.  See Rice v. Barnhart, 384 F.3d 363, 370 n.5 (7th Cir. 2004); see also Magallanes, 881 F.2d at 755 ("It is true that the ALJ did not recite the magic words, 'I reject Dr. Fox's opinion about the onset date

sources may also help us to understand how your impairment affects your ability to work.  (Emphasis added.)  (Joint Stipulation at 7).

because....' But our cases do not require such an incantation. As a reviewing court, we are not deprived of our faculties for drawing specific and legitimate inferences from the ALJ's opinion. It is proper for us to read the paragraph discussing Dr. Pont's findings and opinion, and draw inferences relevant to Dr. Fox's findings and opinion, if those inferences are there to be drawn...").

As to plaintiff's physical impairments, Ms. Kayer not only testified regarding plaintiff's hips, but she testified about limitations to plaintiff's knees.   Yet no physician has found a medically determinable knee impairment.   Finally, Ms. Kayer testified that plaintiff spent her day lying down.   ALJ Ganly specifically addressed this factor, finding that "it is credible that she rests during the day; however there is virtually no evidence to establish a need for such resting." (AR at 365).   The treatment records reveal that plaintiff's physicians never advised her that she should lie down with her legs elevated; rather, this is merely what plaintiff told the physicians that she did.   (See AR at 487).

Thus, it was not improper for the ALJ to discount Ms. Kayer's testimony.   See Ukolov v. Barnhart, 420 F.3d 1002, 1006 n.6 (9th Cir. 2005)("Because the testimony of the lay witness encompassed only symptoms, any failure of the ALJ to adequately address that testimony does not affect the outcome of this case.").

**C.   THE ALJ'S REJECTION OF DRS. MINNA'S AND HAMMATT'S OPINIONS**

An ALJ should give a treating physician's opinion greater weight than that of an examining physician.   See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) ("It is clear that more weight is given to a treating physician's opinion than to the opinion of a non-treating physician because a treating physician 'is employed to cure and has a

18

greater opportunity to know and observe the patient as an individual'") (quoting Magallanes, 881 F.2d at 751; see also Spraque v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987).  "The treating physician's opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate issue of disability." Magallanes, 881 F.2d at 751, citing Rodriquez v. Bowen, 876 F.2d 759,  761-62 and n.7 (9th Cir. 1989).  The proper weight that the ALJ should give to a treating physician's opinion depends on whether sufficient data supports the opinion and whether the opinion comports with other evidence in the record.  See 20 C.F.R. § 404.1527.

However, before rejecting a treating physician's uncontroverted opinion, the ALJ must present clear and convincing reasons for doing so. Andrews, 53 F.3d at 1041; see also Montijo v. Secretary of Health & Human Services, 729 F.2d 599, 601 (9th Cir. 1984).  "Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Furthermore, "where the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict." Andrews, 53 F.3d at 1041.

Both Drs. Hammatt and Minna completed questionnaires on plaintiff's behalf indicating that plaintiff is unemployable.  (AR at 309-10, 336-37).  ALJ Chaffin rejected both opinions on the basis that the suggested limitations were not supported by the objective findings and were based

merely on the subjective complaints of plaintiff.  (AR at 21).  On remand, the ALJ incorporated by reference the prior decision and found that "[t]here is no evidence adduced on remand that there was the slightest doubt on the accuracy of the prior decision."[6]  (AR 363, 365).

Section 404.1527(d)(3) of Title 20 in the Code of Federal Regulations provides that "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the Commissioner] will give that opinion."

In his Medical Evaluation Form, Dr. Hammatt's only diagnosis is trochanteric bursitis with symptoms of progressive hip pain.  However, based uopn his report, no objective tests support patient's symptoms.  (AR at 309).  Additionally, Dr. Hammatt's treatment notes are utterly devoid of any objective clinical findings except for "tender[ness] over greater troch bursa" right more than left in his initial examination of April 17, 2000.  (AR at 223).  When standard treatment reportedly failed to provide relief, Dr. Hammatt indicated that "we now must [rule out] other hip pathology" as a means to explain the extent of plaintiff's symptoms.  (AR at 215).  Yet no other pathology was ever found.  Thus, it appears that Dr. Hammatt relied solely upon plaintiff's subjective complaints regarding her inability to work.  The ALJ's rejection of Dr. Hammatt's opinion, therefore, was sufficiently specific and legitimate and based upon substantial evidence in the record.  See Burkhart v. Bowen, 856 F.2d 1335, 1339-40 (9th Cir. 1988)("While '[t]he subjective

---

[6] Plaintiff suggests that the stipulated remand in SACV 03-1256 was to correct errors made by the first ALJ in rejecting the opinions of Dr. Minna and Dr. Hammatt.  However, there is no evidence to that effect.  In fact, Dr. Mark Janis also rendered an assessment, which both ALJs ignored.

judgments of treating physicians are important,'[the treating physician] provided nothing more than a statement of his unsupported opinion. There was no description - either objective or subjective - of medical findings, personal observations or test reports upon which [the physician] could have arrived at his conclusion")(internal citation omitted); Holohan v. Massanari, 246 F.3d 1195, 1203 (9th Cir. 2001)("Under certain circumstances, a treating physician's opinion on some matter may be entitled to little if any weight.  This might be the case, for instance, if the treating physician . . . presents no support for her or his opinion on the matter," citing 20 C.F.R. § 404.1527(d)(3)); Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995) (Inadequate clinical findings provide specific and legitimate basis for ALJ to reject treating physician's opinion); Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 602 (9th Cir. 1999)("A physician's opinion of disability 'premised to a large extent upon the claimant's own accounts of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted'")(internal citations omitted).

Dr. Minna also appears to have relied solely upon plaintiff's subjective complaints.  In his Medical Evaluation Form dated December 7, 2001, Dr. Minna lists his diagnosis as "right thigh pain - no etiology identified."  (AR at 336).  In response to the questions regarding plaintiff's "symptoms and objective tests supporting patient's symptoms," Dr. Minna indicates only that plaintiff has subjective complaints of right anterior thigh pain. (See AR at 336).  The physical examination was non-diagnostic.  And the laboratory evaluation yielded normal MRI and electrodiagnostic studies.  (Id.)

///

Shortly thereafter, Dr. Minna wrote a letter.  (Id.) He indicated that the restrictions to which he limited plaintiff were based upon plaintiff's consistently poor HAQ (Health Assesment Questionnaire) scores, the physical examination which showed antalgic gait, the requirement for opioid medication on a regular basis and "discussions with the patient of the nature of her job description and the limitations that she felt she demonstrated."  (AR at 332).  The HAQ, however, was purely subjective as were the discussions about the "limitations that she felt she demonstrated." (See AR at 495-96, 500-01, 508-09, 512-13, for example).  Likewise, the requirement for opioid medication was based upon plaintiff's complaints, because the only finding on physical examination was an "antalgic gait," which, even according to Dr. Minna's treatment notes, was not a consistent finding especially after June 2002.  (See AR at 483, 485, 490, 728, 730, 732, 734, 736, 738, 740, 742; see also AR at 655).

Dr. Minna's letter also indicates that the claimed side effects from the medication were also subjective, and while not uncommon, generally they "attenuate."  On the other hand, plaintiff's complaints concerning diminished mentation was not common, "but is reported." This, too, is subjective, and was taken "on face value."  (AR at 332).

Dr. Minna also notes that plaintiff complained of being unable to use her arms and legs on a repetitive basis.  He found that there was no objective finding; i.e., radiographic, or physical exam, which demonstrated arthropathy, or limitation of range of motion.  He stated he was "again accepting the patient's statement at face value."  (Id.)

In a subsequent letter dated October 7, 2004, Dr. Minna indicated that since his evaluation of December 7, 2001, plaintiff's complaints of right thigh pain have remained "stable and stationary."  He reiterated

1   that extensive testing resulted in no specific diagnosis.  (AR at 554).

2        In short, Dr. Minna's various explanatory letters underscore the

3   ALJ's finding of a lack of objective evidence and reliance upon properly

4   discounted subjective complaints.

5        Plaintiff, however, counters that the ALJs' rejection of these

6   physicians' opinions improperly ignores the subjective aspects of the

7   physicians' opinions.  (Joint Stipulation at 14-15, <u>citing</u> <u>Embry v.</u>

8   <u>Bowen</u>, 849 F.2d 418, 421-22 (9th Cir. 1988)).  However, nowhere has

9   either of the physicians indicated any subjective aspects of their

10  opinion – only plaintiff's subjective complaints.  <u>See</u> <u>Burkhart</u>, 856

11  F.2d at 1339-40.  In summary, the ALJ provided sufficiently specific and

12  legitimate reasons for discounting the opinions of Drs. Hammatt and

13  Minna.

14  **D.   DR. MARK JANIS'S OPINION**

15       Plaintiff also contends that the ALJ failed to provide the

16  requisite rationale for rejecting the opinion of another treating

17  physician, Mark Janis, M.D. (Joint Stipulation at 16-18).  Dr. Janis,

18  like Dr. Hammatt and Dr. Minna, also completed a Medical Evaluation

19  Form.  He diagnosed plaintiff with left breast cancer, status post

20  segmental resection, right hip bursitis, osteoporosis, and degenerative

21  disc disease.  He noted that plaintiff had symptoms of pain, weakness,

22  and decreased exercise tolerance and concentration.  Dr. Janis also

23  noted that "objective tests support[ed] patient's symptoms."  (AR at

24  311; <u>see also</u> AR at 313-16, 424-430).  Nevertheless, Dr. Janis concluded

25  that plaintiff must rest seven to eight hours during an eight-hour day.

26  (AR at 312).  Presumably, this was due to the notation that plaintiff

27  was experiencing at that time severe, constant, and daily pain in the

28  right hip.  (AR at 311).

1    Both ALJs failed to address this opinion, thereby failing to comply

2  with the order of remand to "address all relevant medical opinion

3  evidence of record, providing supporting rationale for the weight

4  assigned thereto, to include good reasons if such opinion is rejected."

5  (AR at 373).

6    The Commissioner, however, argues that "the ALJ properly resolved

7  the conflicting medical opinions, including that of Dr. Janis, by

8  relying on the testimony of the medical expert witness, Dr. Vu, who

9  considered all of the record medical evidence." (Joint Stipulation at

10 17).

11   The Court disagrees.  While the testimony of a non-examining

12 physician can constitute substantial evidence upon which the ALJ may

13 rely when it is not contradicted by all other evidence in the record.

14 See Andrews, 53 F. 3d at 1041.  This does not obviate the requirement

15 that the ALJ provide specific and legitimate reasons for rejecting the

16 treating physicians' opinions where the same findings are considered by

17 both the treating and non-treating physicians.  Id., at 1041 ("Where .

18 . . a nontreating source's opinion contradicts that of the treating

19 physician but is not based on independent clinical findings, or rests on

20 clinical findings also considered by the treating physician, the opinion

21 of the treating physician may be rejected only if the ALJ gives

22 specific, legitimate reasons for doing so that are based on substantial

23 evidence in the record"). (Compare AR at 265 with AR at 281).

24   Accordingly, the ALJs' failure to address Dr. Janis's opinion

25 requires yet another remand.  McAllister v. Sullivan, 888 F.2d 599, 603

26 (9th Cir. 1989).

27 ///

28 ///

1  **E.    PLAINTIFF'S MENTAL LIMITATIONS**

2       Plaintiff was referred to Margaret A. Donohue, Ph.D., on March 2,

3  2002, for a psychological evaluation.   This testing revealed that

4  plaintiff suffered an impairment with respect to performing complex

5  tasks, but suffered no impairment as to simple tasks.  (AR at 341).

6  Overall, she found no impairment with respect to plaintiff's immediate

7  memory, but noted that plaintiff had concentration problems.   (AR at

8  342).  Dr. Donohue indicated that plaintiff was able to manage her own

9  funds, but she might need a calculator.  Plaintiff could perform simple

10 work, but she might have problems due to fatigue.  Plaintiff also had

11 some difficulty with concentration, and she might need frequent rest

12 breaks during the day.  (AR at 343).

13      Based, apparently, upon this opinion, the first ALJ found that

14 plaintiff retained the residual functional capacity, <u>inter</u> <u>alia</u>, to

15 perform "simple repetitive tasks."  (AR at 24; <u>see</u> AR at 343).   Even

16 given that the ability to perform simple repetitive tasks does not

17 necessarily mean that plaintiff is <u>limited</u> to simple repetitive tasks,

18 ALJ Chaffin's inclusion of these words in his residual functional

19 capacity assessment is problematic.

20      ALJ Ganly also presumably incorporated by reference ALJ Chaffin's

21 mental residual functional capacity.  Yet, although ALJ Ganly summarized

22 the psychological and psychiatric medical evidence, there is no finding

23 concerning simple repetitive tasks nor is there any discussion or

24 analysis whatsoever indicating a reassessment of plaintiff's mental

25 impairment.  (AR at 366).

26      As plaintiff argues, the finding concerning plaintiff's limitation

27 to simple repetitive tasks is crucial.   If plaintiff is, in fact,

28 limited in such a manner, it is unlikely that she would be able to

perform her past relevant work.  A limitation to even light unskilled work could direct a conclusion of "disabled"[7] once plaintiff attains the age of fifty-five. (Joint Stipulation at 27-28).

Accordingly, this matter also requires remand for clarification of the plaintiff's mental impairment in accordance with 20 C.F.R. 404.1520a.   If, on remand, the ALJ chooses to reject the opinions of Dr. Donohue and reassess the mental residual functional capacity found by ALJ Chaffin, he should set forth his reasons for doing so.  The ALJ should also call a vocational expert.

///

///

///

///

_____

[7] ALJ Chaffin stated in his decision that the vocational expert was asked whether an individual with plaintiff's vocational background "could perform her past relevant work with the following limitations: to lift 20 pounds occasionally, 10 pounds frequently, simple, repetitive tasks, with postural changes (sit/stand) for 6 hours of an 8-hour workday" with no limitations due to deafness in her right ear. According to ALJ Chaffin, "it was the vocational expert's opinion that the hypothetical individual could perform her past relevant work as a teller."  (AR at 23).   There was, however, no hypothetical question posed to the first vocational expert concerning plaintiff's past relevant work which incorporated a limitation to simple repetitive tasks, and it is highly unlikely that with such a limitation, plaintiff could return to the teller job with an SVP of 5, which corresponds to "skilled work."  SSR 00-4p; see Terry v. Sullivan, 903 F.2d 1273, 1276-77 (9th Cir. 1990). A limitation to simple repetitive tasks was included in the hypothetical question concerning "alternative occupations" which plaintiff could perform.   (AR at 69-78).   The vocational expert indicated that with those restrictions, which included a sit/stand option, there would probably not be work to which skills were transferable.   However, "[t]here would be unskilled, light position [sic] for them."  (AR at 75).   Because of her age, a limitation to simple repetitive tasks is crucial.  If plaintiff is precluded from her past relevant work, she could be found disabled if capable only of unskilled light work under Medical Vocational Rule 202.06, Table 2, Appendix 2, Subpart P, 20 C.F.R. Part 404 as of the date she reaches age fifty-five.

**ORDER**

After careful consideration of all documents filed in this matter, this Court finds that the decision of the Commissioner is not supported by substantial evidence.  The Court, therefore, remands the matter tho the Commissioner of the Social Security Administration for further proceedings consistent with this opinion.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: June 30, 2006

_____/s/_____
JENNIFER T. LUM
UNITED STATES MAGISTRATE JUDGE